**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | | |
|---|---|---|
| **LUCA J. RAZZA,** | : | |
| *Plaintiff* | : | |
| | : | |
| **v.** | : | **C.A. No. 25-cv-** |
| | : | |
| **PLASTICS PLUS, INC. d/b/a ENVISION** | : | |
| **SOLUTIONS GROUP, alias, and** | : | |
| **DANIEL J. SMALLEY, SR., alias,** | : | |
| *Defendants* | : | **Jury Trial Demanded** |

**COMPLAINT**

## I.      Introductory Statement

This is an action brought by Plaintiff Luca J. Razza against his former employer, Plastics Plus, Inc. d/b/a enVision Solutions Group, alias, and Daniel J. Smalley, Sr., alias, seeking compensatory, liquidated and punitive damages, counsel fees, costs, and other equitable relief arising out of violations of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.,* the Rhode Island Payment of Wages Act ("RIPWA"), R.I. Gen. Laws § 28-12-1, *et seq.* and § 28-14-1, *et seq.*, and the Rhode Island Whistleblower Protection Act ("RIWPA"), R.I. Gen. Laws § 28-50-1, *et seq.*

## II.      Parties

1.      Plaintiff, Luca J. Razza ("Plaintiff"), is a resident of the Town of Exeter, County of Washington, State of Rhode Island.

2.      Defendant Plastics Plus, Inc. d/b/a enVision Solutions Group, alias, ("Defendant Plastics Plus") is duly organized and incorporated under the laws of the State of Rhode Island with a principal place of business located at 1 Hatch Street, Cumberland, Rhode Island and is doing business in the State of Rhode Island.

3.     Defendant Daniel J. Smalley, Sr., alias, ("Defendant Smalley") is the owner and President of Defendant Plastics Plus and a resident of the City of Providence, County of Providence, and State of Rhode Island.

4.     As used herein, the term "Defendants" refers to all Defendants collectively, unless otherwise indicated expressly or by context.

### III.     Jurisdiction

5.     The United States District Court for the District of Rhode Island has federal subject matter jurisdiction over this matter pursuant to the provisions of 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law; specifically, the FLSA.

6.     Supplemental jurisdiction over the state law claims set forth herein is predicated on 28 U.S.C. § 1367 as they arise out of the same case or controversy.

### IV.     Venue

7.     Pursuant to the requirements set forth in 28 U.S.C. § 1391, venue is proper in this Court insofar as Defendant Plastics Plus does business in the State of Rhode Island and therefore all Defendants are deemed to reside in the District of Rhode Island.  Moreover, a substantial part of the acts and/or omissions giving rise to the claims asserted herein occurred in the District of Rhode Island.

### V.     Material Facts

*FLSA Liability Allegations*

8.     At all times relevant to this action, Plaintiff was an "employee" within the meaning of 29 U.S.C. § 203(e)(1) of the FLSA as well as within the meaning of R.I. Gen. Laws §§ 28-12-2(5) and 28-14-1(4) of the RIPWA employed by the Defendants.

9.    At all times relevant to this action, Defendants were "employer[s]" within the meaning of 29 U.S.C. § 203(d) of the FLSA as well as within the meaning of R.I. Gen. Laws §§ 28-12-2(6) and 28-14-1(5) of the RIPWA employing the Plaintiff.

10.    At all relevant times, Plaintiff was "engaged in commerce or in the production of goods for commerce" within the meaning of, *inter alia*, 29 U.S.C. §§ 203 (b), (i)-(j), 206(a), and 207(a), as an employee employed by and performing work for Defendants.

11.    At all relevant times, Defendants were engaged in related activities performed through unified operation and/or common control for a common business purpose and are, and at all times hereinafter mentioned, were an enterprise within the meaning of 29 U.S.C. § 203(r).

12.    At all relevant times, Defendants individually and/or jointly were an "enterprise engaged in commerce or in the production of goods for commerce" within the meaning of, *inter alia*, 29 U.S.C. § 203(s).

### *Plaintiff's Work Performed for Defendant*

13.    Plaintiff began working for Defendants in or about 1996 as a salesperson.

14.    At all times during his employment, Plaintiff was a dedicated, loyal, and highly valued employee.

15.    As testament to his dedication and skill, in 1999 Plaintiff was able to establish a regular and profitable working relationship between Defendants and CVS.

16.    CVS subsequently made millions of dollars of purchases from Defendants each year over the next twenty-five (25) years.

17.    The close working relationship between Defendants and CVS that Plaintiff initiated brought significant goodwill to Defendant Plastics Plus and was instrumental in creating relationships

with other companies who made large and frequent purchases, both in the United States and internationally.

18. Plaintiff was able to cultivate good relations between Defendants, himself, and a number of companies who became regular customers and, by maintaining said relationships, brought tens of millions of dollars' worth of business to Defendants.

19. By way of example, Plaintiff was able to close over $32,000,000.00 worth of sales during his last five (5) years working for Defendants.

20. Plaintiff's efforts were recognized within Defendants' company throughout his employment.

21. For example, when Defendant Plastics Plus was awarded an Outstanding Supplier Award from one of its customers on February 1, 2024, Plaintiff was privately applauded within the company as "the Sales Rep who makes it happen!"

22. At all times relevant to this Complaint, Plaintiff routinely worked from 9:00 am to at least 5:00 pm to make sales on behalf of Defendants.

23. In addition, Plaintiff would routinely receive pricing information essential to the performance of his duties outside of normal business hours.

24. As a result, Plaintiff would routinely work in excess of forty (40) hours each week for Defendants.

### *Plaintiff's Compensation*

25. As a salesperson, Plaintiff was entitled to a commission on each sale that he made, which funds were held by Defendants in a commission account for his benefit.

26. These commissions were based on the purchase price of the sale, rather than the profit ultimately realized by Defendants.

27. Upon information and belief, it was always Defendants' policy and practice to treat commissions as accrued, due, and payable when payment in full had been made by the customer.

28. At all relevant times prior to the events described in this Complaint, Plaintiff received a weekly payment of $6,000.00 as a draw from his commission account.

29. At all relevant times prior to the events described in this Complaint, Plaintiff's draw, as well as any amounts requested by Plaintiff from his commission account, would be paid to him each week on Friday.

30. Throughout the years, by agreement with Plaintiff, Defendants would defer Plaintiff's commissions for the months of November, December, and occasionally including October, allowing Defendants to defer payments at no expense to them.

31. In all years up to and including 2023 these "pushed" payments (as Plaintiff and Defendants would refer to them) were always paid in January of the following year without issue.

### Delayed Payments on CVS Display Sale

32. Prior to and during 2023, Defendants routinely sold product displays for CVS based on "forecast orders," whereby CVS would submit an estimate of how many displays they would need over a given time and Defendants would manufacture enough product to meet the forecasted demand.

33. CVS would then pay for and receive such displays as needed, with Defendants warehousing any surplus until it was needed and paid for.

34. However, in or about early 2023, CVS placed one or more forecast orders that significantly overestimated their need for the displays manufactured by Defendants, leading to a sizable surplus that had to be warehoused.

35.     In or about May 2023, CVS communicated to Defendants that it was cutting back on its use of the type of displays Defendants manufactured, requiring the surplus displays to be warehoused for an extended period.

36.     Defendant Smalley began encouraging Plaintiff to act as a "collection agent" for the outstanding payments owed by CVS on the sale(s) ("the CVS display sale").

37.     Plaintiff pointed out that this was outside of his work responsibilities and that he would not be paid for any extra work he performed trying to "collect" monies due on the CVS display sale and expressed reluctance to do so.

38.     Nonetheless, Plaintiff used his relationship with individuals at CVS to encourage them to pay the monies due to Defendants on the CVS display sale.

39.     Defendants unilaterally attempted to charge CVS a $40,227.00 "disposal fee" for the unused inventory that it had warehoused.

40.     CVS disputed the disposal fee and upon information and belief refused to pay it.

41.     In the interim, Defendants withheld Plaintiff's commission on the CVS display sale and all other sales made to CVS pending CVS paying for all of the warehoused product and the disposal fee.

### October 2023 Exchange Rate Error

42.     On or about October 13, 2023, Defendants' employee, Susan Hosey, noticed that an apparent error in the exchange rate between Canadian and U.S. dollars[1] resulted in a payment of $60,443.54, instead of the $62,342.00 Defendants were expecting, on a sale closed by Plaintiff ("the Canadian sale"), a difference of $1,898.46.

---

[1] For clarity, all amounts used in this Complaint are given in U.S. dollars.

43.    Ms. Hosey emailed the customer on October 13, 2023, to advise them of the error and request full payment.

44.    On October 19, 2023, the customer sent Ms. Hosey an email that denied that there was an error and refused to pay the additional $1,898.46.

*Initial Commissions Withheld and Retaliation*

45.    On October 13, 2023, unaware of the above, Plaintiff made an agreement with Defendants to "push" any remaining or future commissions owed to Plaintiff for year 2023 to the following year, with payment due to Plaintiff on January 1, 2024.

46.    On November 11, 2023, Defendants issued a monthly sales report for Plaintiff that included a note from Defendants that they were withholding $63,298.75 of Plaintiff's earned commissions, including Plaintiff's entire commission on the Canadian sale.[2]

47.    In addition, the November 11, 2023, commission report noted that, if Defendants ultimately did not recover the $1,898.46 that they believed they were entitled to on the Canadian sale, then they "…would need to adjust [Plaintiff's] sales down by the full $62,342.00 commissionable total[,]" resulting in Plaintiff losing his entire commission on that sale.

48.    Defendants also stated they would withhold commissions on at least twenty-three (23) separate sales made to CVS and at least six (6) unrelated customers between May 1, 2023, and November 11, 2023, that had become due and payable until, "the CVS issue has been resolved."

49.    Plaintiff received the November 11, 2023, commission report on or about November 27, 2023.

---

[2] The entire commission owed to Plaintiff on the Canadian sale was $4,675.65.

50. On November 27, 2023, Plaintiff emailed Ms. Hosey to ask why the entire commission on the Canadian sale was being withheld when $60,443.54 had been received and why an issue with CVS was holding up commissions from non-CVS sales.

51. Ms. Hosey replied the same day claiming that she had "only" reduced Plaintiff's commissionable sales by $1,800.00, roughly the amount Defendants believed they were still entitled to receive from the Canadian sale.

52. Ms. Hosey also stated that, "[p]er Company Policy, Commission [sic] is paid when the order had been paid in full unless there is an adjustment to be agreed upon with [Daniel J. Smalley] Sr."

53. Ms. Hosey suggested that Plaintiff discuss the issues with Defendant Smalley, who was in Florida but expected to return on December 4, 2023.

54. The following day, November 28, 2023, Plaintiff responded to Ms. Hosey's email asking for clarification on Defendants' company policy on paying commissions, specifically that commissions would not be paid if the customer underpaid, regardless of the amount of underpayment.

55. Notably, this was the first time during Plaintiff's employment that Defendants brought up alleged deductions for agreed upon adjustments or withholdings based underpayment; such conditions were never previously part of the commission policy or practices.

56. Plaintiff also asked for clarification on a separate sale for which he did not have the commission calculations, and requested to review them.

57. Ms. Hosey responded later that day that Defendant Smalley had given her "strict orders that he [would] handle this with you [Plaintiff]" when he returned on December 4, 2023.

58.    On or about December 4, 2023, Defendant Smalley emailed Plaintiff about a sale where Defendants had submitted a bid $4,000.00 lower than intended, resulting in them being the low bidder and getting the sale ("the Meijer Venus sale").

59.    Defendant Smalley requested that Plaintiff see if the customer would agree to pay the higher price that Defendants had intended to submit as a bid.

60.    Although Plaintiff reached out to the customer, they were not willing to pay the higher price.

61.    When Defendant Smalley learned that the customer would not pay the higher price, he processed the Meijer Venus sale as a sample, essentially providing a sample product, on which Plaintiff did not receive commission.

62.    On December 21, 2023, Plaintiff emailed Defendant Smalley to inquire about the recent issues with his commissions, specifically:

    a.    Why his full commission on the Canadian sale had been withheld due to the $1,898.46 underpayment;

    b.    Why his commissions were being withheld over "the CVS issue," which he understood to be the uncollected payments and disposal fee from the CVS display sale;

    c.    Why Defendant Smalley had put the Meijer Venus sale through as a sample, denying Plaintiff a commission on the same; and

    d.    Requested to review his commission calculations for the sale he discussed with Ms. Hosey on November 28, 2023.

63.    Plaintiff also requested that his "pushed" commissions from 2023 be paid on January 5, 2024, instead of January 1 as he originally requested.

64. Defendant Smalley replied the next day, December 22, 2023, that he was on vacation and would review Plaintiff's questions and concerns when he returned on January 6, 2024.

### *Defendants Failure to Pay Commissions/Wages Owed and Further Retaliation*

65. Plaintiff was not paid his "pushed" commissions from 2023 on January 5, 2024.

66. The withholding of earned commissions violated Defendants' commissions policy, which entitled Plaintiff to his earned commissions as soon as payment in full had been made.

67. Defendants also suddenly stopped paying Plaintiff's weekly $6,000.00 draw beginning the first week of January, 2024.

68. In addition, Defendants began withholding commissions for Plaintiff's new sales.

69. In the interim, Defendant Smalley did not address Plaintiff's questions about his commissions until January 30, 2024, when he emailed Plaintiff that he was once more in Florida but that he would "get on top of it" when he returned to the office on February 1, 2024.

70. Defendant Smalley next addressed Plaintiff's questions in an email on February 6, 2024, stating that, "…this is rather complicated but we are working thru [sic] it."

71. Defendant Smalley's February 6 email also suggested that there were "many items still open that need your attention," though it did not state why Plaintiff needed to address these items in order for Defendants to pay his earned commissions or whether they were connected to the issues surrounding Plaintiff's commission.

72. The "items" listed by Defendant Smalley were:

   a. Obtaining payment for the disposal fees for the CVS display sale;

   b. An unspecified problem with a payment order on disposal fees for another portion of inventory; and

    c.   That Plaintiff had charged a customer for samples in an order where they should have been provided at no charge.

73.    None of the items pointed out by Defendant Smalley were pre-conditions to payment of commissions under Defendants' commissions policy.

74.    From February 2024 through March 2024, Plaintiff asked Defendant Smalley to address the issues with his unpaid commissions when he could, but Defendant Smalley continued to put off discussions and took no action.

### *Defendants' First Partial Payment and Improper Deduction for the Canadian Sale*

75.    On May 3, 2024, Defendants made their first payment to Plaintiff since 2023 for his work, disbursing $49,834.43 from his commission account.

76.    Plaintiff received zero payment from Defendants, either via draws or commissions, from January 1, 2024 up to May 3, 2024 despite working his normal schedule during that time.

77.    Included in the disbursal was a partial $2,875.65 commission for the Canadian sale, which should have been paid to Plaintiff on January 5, 2024.

78.    Defendants reduced the $4,675.65 commission owed by approximately $1,800.00 to which Plaintiff was entitled from the Canadian sale, which, upon information and belief, was to compensate Defendants for the underpayment that resulted from the exchange rate error.

79.    Said withholding was done without Plaintiff's permission and against his explicit wishes.

80.    In addition, the disbursal on May 3, 2024, reflected commissions due on at least eleven (11) additional sales that were three (3) or more weeks late at the time they were paid.

*Additional Commission Denied*

81.     On May 31, 2024, Defendants issued their usual monthly commission report to Plaintiff.

82.     This commission report showed, for the first time, that Plaintiff was being denied a commission for a $32,389.50 sale that he had made in March 2024 to Chase Design ("the Chase sale"), on which he was entitled to receive a commission of approximately $2,429.21.

83.     The reason given in the report for denying Plaintiff this commission was that the job was completed at a loss.

84.     Defendants had never previously denied commissions to their salespeople if jobs were completed at a loss.

*Defendants' Second and Third Partial Payments and Improper Deduction for Disposal Fees*

85.     On June 24, 2024, Defendants dispersed $50,485.19 from Plaintiff's commission account, their second payment to Plaintiff in 2024.

86.     This payment was for the commission on one or more orders that Plaintiff had made in or about May 2024, which were due by or before June 7, 2024.

87.     Upon information and belief, CVS finished paying for the CVS display sale in or about June 2024.

88.     However, CVS continued to dispute the disposal fee and upon information and belief did not pay the same.

89.     On July 3, 2024, Defendants disbursed $48,705.50 from Plaintiff's commission account representing the commissions for at least forty-five (45) sales, at least forty-four (44) of which were late by twenty-six (26) days or more.

90.     Moreover, Defendants withheld a total of $40,227.00 from this payment, representing the unpaid disposal fees contested by CVS.

91.     Said withholding was done without Plaintiff's permission and against his explicit wishes.

### *Plaintiff's Inquiry into Late Payments and Further Retaliation*

92.     On July 24, 2024, Defendant Smalley sent a text message to Plaintiff apologizing for "leaving [him] hanging," and claiming that he would be in touch about some of the issues surrounding his withheld commissions, "when all the information is available."

93.     On August 8, 2024, Plaintiff sent a text message to Defendant Smalley asking to set up a meeting in the upcoming week to discuss his unpaid commissions.

94.     Defendant Smalley replied on August 9, 2024, with his availability, and the two scheduled a meeting for August 15, 2024, at 11 a.m.

95.     At the August 15 meeting, it quickly became clear that Defendant Smalley was not willing to release the withheld commissions to Plaintiff.

96.     By way of example, when Plaintiff noted that the entire disposal fee charged to the CVS display sale had been withheld from his commissions in violation of longstanding company policy, Defendant Smalley responded by saying, "I'm not going to take the hit on that!"

97.     Plaintiff replied that he had nothing to do with the decision to charge a disposal fee and that he was not compensated for any efforts he made to recover the same.

98.     Defendant Smalley responded that the situation was difficult, claiming Defendants had not made a profit off of CVS' business in the past four (4) years.

99.     Plaintiff explained that Defendants' ability to make a profit off of sales to CVS had never before been a basis to withhold commissions.

100.    Plaintiff also expressed skepticism that Defendants had not been able to make a profit from CVS' business in four (4) years, especially given that the period covered the COVID pandemic when Defendants manufactured the plastic dividers used by CVS, resulting in a significant increase in business.

101.    Defendant Smalley expressed that he had a lot to think about and would get back to Plaintiff about these issues.

102.    Notwithstanding, Plaintiff never received a follow-up communication from Defendant Smalley.

103.    On September 2, 2024, Plaintiff emailed Defendant Smalley about the commissions withheld over the exchange rate error on the Canadian sale, the ultimate profitability of the Chase sale, and CVS' reluctance to pay the disposal fees.

104.    In that email, Plaintiff also reiterated his request to see the commission calculations for the sale that he had requested from Ms. Hosey on November 28, 2023.

### *Retaliatory Termination*

105.    On September 12, 2024, Defendant Smalley sent a text message to Plaintiff asking to get together with him to discuss his concerns and questions regarding his commission.

106.    On September 17, 2024, Plaintiff responded to Defendant Smalley's September 12, 2024, text asking to meet whenever Defendant Smalley was available.

107.    Defendant Smalley replied on September 18, 2024, that he was trying to develop a "settlement package" and would forward it to Plaintiff later that day.

108.    On September 25, 2024, Plaintiff received a settlement agreement in which Defendants offered to pay Plaintiff most of the commissions that he was owed if he would agree to termination and release any potential claims arising out of his employment, among other terms.

109. Specifically, Defendants offered to pay a lump sum of $44,558.20 within five (5) days of Plaintiff signing the agreement as well as a total of $41,044.21 in commissions for six (6) specified sales if payment on the same was received in full.

110. These items did not include the Chase sale, which Defendants had indicated that they would not pay because it was completed at a loss.

111. Although Plaintiff did not want to end his employment with Defendants and intended on remaining employed with Defendants for the remainder of his career until retirement, he did not see another way forward and wrote Defendant Smalley an email on September 25, 2024, stating that he would agree to the settlement in substance if Defendants would agree to include the $2,429.21 commission on the Chase sale and pay Plaintiff in one lump sum.

112. On September 26, 2024, Defendant Smalley replied to Plaintiff's email, refusing to make the suggested changes, demanding an answer on whether he would accept the unmodified settlement agreement, and informing Plaintiff that, "either way, tomorrow we will complete the transition and as a courtesy to all we would like to phrase this as retirement."

113. Plaintiff refused to sign the settlement agreement and never agreed to retire or resign.

114. On September 27, 2024, Defendants fired Plaintiff.

115. Subsequent to Plaintiff's firing, Defendants falsely informed customers and employees that Plaintiff had voluntarily retired.

116. On December 16, 2024, Plaintiff received a check for $36,285.82 from Defendants, purporting to be commission on four (4) of the seven (7) sales for which he had not been paid at the time of his termination.

### *Commissions Remaining Unpaid*

117. As of filing, Plaintiff is owed at least $47,487.41 in commissions that became due and payable, but remain unpaid by Defendants, on which he is owed at least $94,947.82 in liquidated damages, including without limitation:

   a. The $40,227.00 disposal fee that has been improperly withheld from payment on at least twenty (20) orders made by CVS, that should have been paid, various dates between January 5, 2024 and June 7, 2024 and,

   b. $7,260.41 in commissions for sales where the customer had paid in full on or prior to Plaintiff's termination, earned on dates between March 31, 2024, and September 25, 2024, that should have been paid, at the latest, on October 4, 2024.

### *Plaintiff was a Non-Exempt Employee of Defendants*

118. Throughout the course of his employment with Defendants, Plaintiff reported to and was supervised by Defendant Smalley.

119. Throughout the course of his employment with Defendants, Plaintiff performed sales for Defendant Plastics Plus on a daily basis as directed by Defendant Smalley.

120. At all relevant times, Plaintiff was completely dependent upon Defendants to authorize the terms of his sales and the prices he was permitted to offer perspective customers.

121. At all relevant times, Defendants had partial or total authority to hire and fire Plaintiff.

122. At all relevant times, any compensation paid to Plaintiff from Defendants was made via W-2 payroll checks with applicable state and federal deductions.

123. At all relevant times, Defendants were responsible for all financial overhead of Defendants' business, including all of their employees' wages.

124.    At all relevant times, Plaintiff was not responsible for payment or contributing to the payment of any financial overhead of Defendants' business and did not hold equity or ownership interest in the same.

125.    Defendants, and not Plaintiff, paid all advertising expenses for Defendants' business.

126.    Defendants never shared with Plaintiff their business-related profits derived from Defendants.

127.    At all times relevant to this Complaint, Plaintiff was customarily and regularly employed at a fixed site, specifically, his home office.

128.    As Plaintiff used his home office as a fixed "headquarters" for soliciting sales, he is considered to have worked at his employer's place of business, as that phase is defined by the FLSA.

129.    Moreover, to the extent that Plaintiff occasionally attended events or conventions away from his home office or any other place of business maintained or operated by his employer, Plaintiff attended these events only rarely, usually less than once a month.

130.    As Plaintiff only occasionally traveled from his home office or other place of business maintained or operated by his employer, he was not customarily and regularly engaged in outside sales, nor subject to the minimum wage or overtime exemptions for such employees contained in the FLSA.

131.    Likewise, Plaintiff was not an executive, administrative, professional or computer employee, nor was he paid on a salary, fee, or hourly basis as the forgoing terms are defined in the FLSA.

132.    Therefore, at all relevant times, Plaintiff was a non-exempt employee entitled to payment of at least minimum wage for all hours worked and for overtime wages as defined under the FLSA and RIPWA.

### *Minimum Wage Violations under the FLSA and RIPWA*

133.    In violation of the FLSA and RIPWA, Plaintiff worked with Defendants' knowledge and consent, yet was paid *nothing* because Defendants refused to pay the weekly draw that Defendants had agreed to, during each of thirty-two (32) one-week pay periods as follows:

    a.    Seventeen (17) weeks between December 30, 2023, and April 26, 2024;

    b.    Seven (7) weeks between May 4, 2024, and June 21, 2024;

    c.    Five (5) weeks between July 6, 2024, and August 9, 2024;

    d.    One (1) week between August 31, 2024, and September 6, 2024; and

    e.    Two (2) weeks between September 14, 2024, and September 27, 2024.

134.    Defendants furthermore failed to pay Plaintiff for the overtime hours he worked on most, if not all, of the thirty-two (32) weeks listed above.

135.    As a result, Plaintiff was deprived of $192,000.00 in weekly draw payments that were improperly withheld, resulting in minimum wage violations for each of those thirty-two (32) weeks, on which Plaintiff is owed liquidated damages.

### *Failure to Pay Wages When Due*

136.    At all relevant times, Defendants were employers as defined by 29 U.S.C. § 203(d) and R.I. Gen. Laws §§ 28-12-2(6) and 28-14-1(5) in that they were persons acting directly or indirectly in the interest of an employer in relation to Plaintiff, their employee.

137.    At all relevant times, Plaintiff's accrued commissions were wages as defined in R.I. Gen. Laws §§ 28-12-2(8) and 28-14-1(6) in that they consisted of compensation that was due to Plaintiff, an employee of Defendants, by reason of Plaintiff's employment.

138.    Pursuant to 29 U.S.C. § 206(b), Defendants are obligated to pay all wages in full promptly when due.

139.    Pursuant to R.I. Gen. Laws § 28-14-2, Defendants are obligated to pay all wages in full within nine (9) days of the end of the payroll period for which wages are computed or on demand at any time thereafter.

140.    Defendants violated each of the forgoing laws and statutes by failing to promptly pay Plaintiff *at least* $192,509.02 in commissions on at least sixty-six (66) sales when the same became due and payable to him, each time delaying payments for two (2) weeks or more, between January 5, 2024 and the date of his termination, on which he is owed liquidated damages of at least $385,018.04.

141.    Upon information and belief, Defendants have not paid Plaintiff or have made late payments for additional sales that became due since the date of his termination.

### *Failure to Compensate Plaintiff for All Hours Worked*

142.    Despite the fact that Plaintiff was a non-exempt employee, Defendants failed or refused to pay Plaintiff overtime pay on numerous workweeks as required by the FLSA and RIPWA.

143.    Defendants knew or had reason to believe that Plaintiff was working in excess of forty (40) hours weekly on a regular basis.

144.    Even where an employer claims lack of any direct knowledge of unclaimed overtime hours worked, knowledge by supervisors of an employee's overtime is imputed to the employer for purposes of determining an employer's liability under the FLSA.

### *Retaliation Under the FLSA*

145.    Pursuant to 29 U.S.C. § 215(a)(3), any person who or that discharges or in any other manner discriminates against any employee because such employee has filed any complaint or instituted or caused to be instituted any proceeding under or related to the FLSA.

146.    During his employment, Plaintiff complained about Defendants' failure to pay him his commissions, the late payment of his commissions, and the improper and illegal deductions

withheld from to Plaintiff's commissions, each of which constitute violations of the FLSA, including without limitation on the following occasions:

    a. Plaintiff's December 21, 2023, email to Defendant Smalley complaining of, among other things, Defendants withholding his commissions until an unrelated "disposal fee" was paid;

    b. Plaintiff's February 21, 2024, text to Defendant Smalley complaining that he had not been paid on January 5, 2024 as previously agreed to nor since, and requesting Defendants remedy the matter;

    c. In correspondence with Defendant Smalley setting up a meeting on March 20, 2024, to discuss Defendants' failure to pay Plaintiff's commissions, which was subsequently cancelled by Defendant Smalley;

    d. In a meeting with Defendant Smalley on August 15, 2024, where Plaintiff complained that Defendants were withholding his pay based on irrelevant and improper factors, such as payment of fees unrelated to Plaintiff's commissions and the profitability of certain contracts; and

    e. In a September 2, 2024, email complaining about unauthorized and improper deductions from his commissions, failure to pay his commission, and late payment of those commissions which Defendants did pay.

147. Defendants violated 29 U.S.C. § 215(a)(3) in multiple ways, including without limitation:

    a. Refusing to let Plaintiff review records showing how his commissions were calculated;

    b. Withholding commissions for weeks or months at a time;

c.  Denying Plaintiff his weekly draw;

d.  Unilaterally conditioning payment of earned commissions on collecting unrelated fees from customers, for no additional compensation;

e.  Unilaterally withholding payment of earned commissions when said fees were not collected;

f.  Subjecting Plaintiff to vague and minor criticisms in response to legitimate inquiries into unpaid commissions;

g.  Requiring Plaintiff to sign a release of claims and agree to termination in order to receive *some* of his earned commissions; and

h.  Terminating Plaintiff after he complained about Defendants' failure to pay wages owed and refused to sign a release and resign.

### *Retaliation Under the RIPWA*

148.  Pursuant to R.I. Gen. Laws § 28-12-16, any employer who or that discharges or in any other manner discriminates against any employee because the employee has made any complaint to his or her employer because they have not been paid wages in accordance with the provisions of Title 28, Chapter 12, violates the RIPWA.

149.  Likewise, pursuant to R.I. Gen. Laws § 28-14-19.3, no employer, or any person acting on behalf of the employer, may discharge or otherwise discriminate or retaliate against an employee for asserting or reporting a violation of the RIPWA.

150.  Defendants violated §§ 28-12-16 and 28-14-19.3 of the RIPWA in multiple ways, including without limitation those discussed above.

### *Retaliation under the RIWPA*

151.    At all relevant times, Defendant Plastics Plus was an employer as defined in R.I. Gen. Laws § 28-50-2(2) in that it accepted services from Plaintiff performed for wages under a contract of hire.

152.    Pursuant to R.I. Gen. Laws § 28-50-3(4), any employer who discharges, threatens, or otherwise discriminates against an employee regarding the employee's compensation, terms, conditions, or privileges of employment because the employee reports verbally or in writing to the employer a violation of a law or regulation or rule promulgated under the laws of this state which the employee knows or reasonably believes has occurred or is about to occur, violates the RIWPA.

153.    Defendant Plastics Plus violated § 28-50-3(4) of the RIWPA in multiple ways, including without limitation those discussed above, and particularly in terminating Plaintiff's employment in retaliation for complaining about Defendants' failure to pay Plaintiff commissions/wages in violation of the FLSA and RIPWA.

### *Retaliatory Motive*

154.    The fact that Defendants' acts, as described above, deviated from their normal business practices suggests that the same were not taken for any legitimate business reasons but to retaliate against Plaintiff for complaining about violations of the FLSA and RIPWA.

155.    The temporal proximity of Defendants' acts or omissions, as described above, in relation to Plaintiff's protected conduct suggests that Defendants' acts or omissions not done for any legitimate business reasons but to retaliate against Plaintiff for complaining about violations of the FLSA and RIPWA.

156.    Such retaliatory acts or omissions include without limitation:

a.   restricting Plaintiff's communications regarding compensation to Defendant Smalley within one day of his first inquiry about withholding commissions;

b.   Defendants' refusal to allow Plaintiff to review records showing how his commissions were calculated, starting within one day of his first inquiry about withholding commissions;

c.   putting a sale through as a sample on which Plaintiff was not entitled to commission within one month of his first inquiry about withholding commissions;

d.   denying Plaintiff his weekly draw within two months of his first inquiry about withholding commissions and fifteen days after first inquiring about improper deductions on his commissions;

e.   withholding Plaintiff's "pushed" commissions within two months of his first inquiry about withholding commissions and fifteen days after first inquiring about improper deductions on his commissions; and,

f.   suddenly subjecting Plaintiff to vague criticisms over minor issues within three months of his first inquiry about withholding commissions and two months after first inquiring about improper deductions on his commissions.

157.   The fact that Plaintiff was subjected to higher scrutiny following his inquiries and complaints regarding withheld payments further suggests that the increased criticisms were not made for any legitimate business reasons but to retaliate against Plaintiff for complaining about violations of the FLSA and RIPWA.

158.   The fact that Defendants failed to offer any reason for demanding Plaintiff's termination as a condition of receiving his earned commissions or for terminating Plaintiff suggests

that Plaintiff was not terminated for any legitimate business reasons but to retaliate against Plaintiff for complaining about violations of the FLSA and RIPWA.

### Defendant Smalley's Liability

159. In his capacity as Owner and President of Defendant Plastics Plus, Defendant Smalley retained and executed operational control over the business and financial affairs of Defendant Plastics Plus.

160. Defendant Smalley was responsible for paying employees to work at Defendant Plastics Plus.

161. Defendant Smalley had operational control over all aspects of Defendant Plastics Plus' day-to-day business-related functions.

162. Defendant Smalley directed all of Defendant Plastics Plus' employment practices, including by setting Plaintiff's commissions.

163. At all relevant times, Defendant Smalley had active control and management over Defendant Plastics Plus' in relation to the employees working there, including Plaintiff.

164. Defendant Smalley willfully and intentionally created, established, permitted, condoned, and enforced a policy whereby Plaintiff's commissions were unlawfully withheld for months at a time.

165. Defendant Smalley willfully and intentionally created, established, permitted, condoned, and enforced a policy whereby Defendant Plastics Plus made multiple large and unlawful deductions from Plaintiff's commissions when sales were less profitable than anticipated or customers contested tacked-on disposal charges unrelated to Plaintiff or his work.

166.    Defendant Smalley willfully and intentionally created, established, permitted, condoned, and enforced a policy whereby Plaintiff was unlawfully denied his weekly draw from January 5, 2024, to September 27, 2024.

167.    At all times relevant hereto, Defendant Smalley knew that Plaintiff was being subjected to the above policies in contravention of how Defendants had compensated Plaintiff for the previous twenty-seven (27) years.

168.    Defendant Smalley had the ability to, and did in fact, exert full authority over the above policies, delaying and denying Plaintiff his accrued commissions as described above.

169.    Upon information and belief, Defendant Smalley is either the sole or partial owner for Defendant Plastics Plus with operational control over the same and/or otherwise intentionally and/or knowingly profited directly or indirectly from Plaintiff's illegal under-compensation and delayed compensation.

170.    Accordingly, Defendant Smalley controlled Defendants' financial affairs and was responsible for the above-described unlawful payment scheme and the failure to compensate Plaintiff for at least the agreed-upon commissions that Plaintiff enjoyed from his hiring in 1996 to May 2023.

## VI.    Claims for Relief

171.    Plaintiff incorporates the allegations in Paragraphs 1 through 170 above in each of the counts set forth below.

**COUNT ONE**
*Fair Labor Standards Act,*
*29 U.S.C. § 201, et seq.*
**Failure to Pay Minimum Wage**

172.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to, those described herein, violated the FLSA by failing to pay for all hours worked as

provided therein, thereby causing Plaintiff to suffer damages as aforesaid, for which he is entitled to relief pursuant to 29 U.S.C. § 216.

**COUNT TWO**
***Fair Labor Standards Act,***
***U.S.C. § 201, et seq.***
<u>**Retaliation**</u>

173.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the FLSA, thereby causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the FLSA.

**COUNT THREE**
***Rhode Island Payment of Wages Act,***
***R.I. Gen. Laws § 28-12-1, et seq., and***
***R.I. Gen. Laws § 28-14-1, et seq.***
<u>**Failure to Pay Wages**</u>

174.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, violated the RIPWA by failing to pay Plaintiff his wages, as provided herein, thereby causing Plaintiff to suffer damages as aforesaid, for which he is entitled to relief pursuant to R.I. Gen. Laws § 28-14-19.2 and § 28-14-20.

**COUNT FOUR**
***Rhode Island Payment of Wages Act,***
***R.I. Gen. Laws § 28-14-1, et seq.***
<u>**Retaliation**</u>

175.    Defendants, by their individual and/or concerted acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the RIPWA, thereby causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RIPWA.

**COUNT FIVE**
*Rhode Island Whistleblower Protection Act*
*R.I. Gen. Laws § 28-50-1, et seq.*
**Retaliation for Complaining about Violations of the FLSA and RIPWA**

176.    Defendant Plastics Plus, by its acts and/or omissions, including, but not limited to those described herein, engaged in unlawful retaliation against Plaintiff in violation of the RIWPA, thereby causing Plaintiff to suffer damages as aforesaid, and thereby deprived Plaintiff of rights secured under the RIWPA.

## VII.    Prayers for Relief

**WHEREFORE**, Plaintiff prays that this Honorable Court grant the following relief:

1.    A declaratory judgment declaring that the acts and/or omissions of Defendants, including, but not limited to those complained of herein, are in violation of the FLSA, RIPWA, and the RIWPA.

2.    An injunction directing Defendants to take such affirmative action as is necessary to refrain from such conduct as is necessary to ensure that the effects of these unlawful employment practices are eliminated and not repeated.

3.    An award of compensatory damages.

4.    An award of punitive damages.

5.    An award of treble damages.

6.    An award of liquidated damages pursuant to 29 U.S.C. § 216(b).

7.    An award of liquidated damages of two times the amount of wages and and/or benefits owed pursuant to R.I. Gen. Laws § 28-14-19.2, § 28-14-20 and § 28-50-4.

8.    An award of reasonable attorneys' fees and costs pursuant to 29 U.S.C. § 216(b).

9.    An award of reasonable attorneys' fees and costs pursuant to R.I. Gen. Laws § 28-14-19.2, § 28-14-20 and § 28-50-4.

10.     An award of other appropriate equitable relief pursuant to 29 U.S.C. § 216(b).

11.     An award of other appropriate equitable relief or penalties pursuant to R.I. Gen. Laws § 28-14-19.2.

12.     An award of such other and further relief as this Honorable Court deems just and proper.

## VIII.   Demand for Jury Trial

Plaintiff hereby demands a trial by jury on all counts so triable.

## IX.     Designation of Trial Counsel

Plaintiff hereby designates Danilo A. Borgas, Esq. and Richard A. Sinapi, Esq. as trial counsel.

                                        Plaintiff,
                                        Luca J. Razza,
                                        By his attorneys,
                                        **SINAPI LAW ASSOCIATES, LTD.**

                                        **/s/ Danilo A. Borgas**
**Dated:  March 10, 2025**              **Danilo A. Borgas, Esq. (#9403)**
                                        **Richard A. Sinapi, Esq. (#2977)**
                                        2374 Post Road Suite 201
                                        Warwick, RI 02886
                                        Phone: (401) 739-9690; FAX: (401) 739-9490
                                        Email: dab@sinapilaw.com
                                                ras@sinapilaw.com